Filed 4/26/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| BRIAN Y. CHUN, | B295140 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BV032724) |
| v. | |
| FREDY DEL CID et al., | |
| Defendants and Appellants. | |
| | B295141 |
| BRIAN Y. CHUN, | (Los Angeles County Super. Ct. No. BV032723) |
| Plaintiff and Respondent, | |
| v. | |
| GLORIA SALAVERRIA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Appellate Division, Sanjay T. Kumar, Alex Ricciardulli and Tony L. Richardson, Judges.  Reversed.

Eviction Defense Network, Elena I. Popp and Sean Chandra for Defendant and Appellants.

Law Office of Allen R. King and Allen R. King for Plaintiff and Respondent.

Michael N. Feuer, City Attorney (Los Angeles), Blithe S. Bock, Assistant City Attorney, Deborah Breithaupt, Elaine Zhong and Jonathan H. Eisenman, Deputy City Attorneys, as Amicus Curiae upon request of the Court of Appeal.

## INTRODUCTION

Defendants and appellants Gloria Salaverria and Fredy, Furgencia, and Elmer Del Cid (collectively, Tenants) rented bedrooms in a residential building located on Hoover Street in Los Angeles (Property), owned by plaintiff and respondent Brian Y. Chun (Landlord).  Salaverria rented one bedroom, and the Del Cids together rented one or more separate bedrooms.  Landlord brought an unlawful detainer action against Tenants, which was tried on stipulated facts.  The sole issue was whether the Property fell within the single–family dwelling exemption to the Rent Stabilization Ordinance of the City of Los Angeles (Ordinance).  (§ 151.00 et seq.)[1]  Under the relevant definitions of section 12.03 (incorporated by reference into the Ordinance), the exemption applies to a "detached dwelling containing only one dwelling unit," a "dwelling unit" being defined as "two or more

---

[1]     Subsequent undesignated section references are to the Los Angeles Municipal Code.

2

rooms, one of which is a kitchen, designed for occupancy by one family for living and sleeping purposes." A "family" means "[o]ne or more persons living together in a dwelling unit, with common access to, and common use of all living, kitchen, and eating areas within the dwelling unit."

The undisputed facts established that the Property was originally constructed in 1908 as single–family dwelling. However, in 1946, the Property, then a being used as a rooming house for 6 households, was expanded to accommodate 7 households in 10 rooms. Currently the Property has 9 bedrooms, at least two bathrooms, and one kitchen. Four of the bedrooms are being separately rented to four separate households. The tenants share access to the bathrooms and kitchen, but they do not have access to each other's rooms. Rather, each tenant has exclusive use of his or her own bedroom, which is equipped with a lock to exclude others.

On these facts, the trial court ruled that the Property does not meet the definitional criteria of the single–family dwelling exemption. On Landord's appeal, the Appellate Division of the Superior Court reversed. We granted Tenants' petition to transfer the case to this court. We now reverse the appellate division. In particular, we hold that regardless of the original design and use of the Property, its current configuration (nine bedrooms, two bathrooms, and one kitchen) and current use for occupancy (four individual bedrooms rented to separate households who share the kitchen and bathrooms, but who alone have exclusive access to and use of their rooms) does not qualify for the single–family dwelling exemption from the Ordinance, because it

3

is not a "detached dwelling containing only one dwelling unit" within the meaning of section 12.03.

## BACKGROUND

*Trial Court Proceedings*

In their answers to Landlord's unlawful detainer complaints, Tenants asserted as an affirmative defense that Landlord's demand for possession violated the Ordinance.[2] In March 2018, separate bench trials were conducted on identical stipulated facts and testimony.

The parties stipulated to the following facts:

"1. The [P]roperty that is the subject of this action was originally constructed as a Dwelling, one family;
"2. The [P]roperty . . . is located in the City of Los Angeles;
"3. The [P]roperty . . . was built and/or has a certificate of occupancy that was first issued before October 1978;
"4. The housing accommodation that is the subject of this action is a room in a dwelling, with access to a shared bathroom and shared kitchen;
"5. The [P]roperty . . . has 9 bedrooms;
"6. The [P]roperty . . . currently has 4 bedrooms that are each being separately rented to four separate households/families.
"7. The [P]roperty . . . has one kitchen;
"8. The [P]roperty . . . has at least 2 bathrooms."

---

[2] The two unlawful detainer cases involve the same plaintiff, the same legal theories, the same residential structure (although different bedrooms), nearly identical complaints and amended answers, and the same stipulated facts. Accordingly, unless otherwise indicated, references to trial and appellate proceedings refer to both the Salaverria and Del Cid actions. To that end, on its own motion, this Court ordered the appeals consolidated for purposes of oral argument and decision.

4

The parties also stipulated that four families resided in the Property, each of which had exclusive use of their own bedrooms, equipped with locks to exclude all others.

Susan Gosden, Assistant Director of the Los Angeles Housing and Community Investment Department (Housing Department), testified in the Del Cid action, and her testimony was received by stipulation in the Salaverria case.[3] One of Gosden's responsibilities is to determine which properties are subject to the Ordinance, and which were not. She explained that the Property was originally built in 1908 as a single–family residence and used for residential purposes until at least until 1926 (when a permit was issued to add a garage). Sometime between 1926 and 1946, the Property began being used as a "rooming house." In 1946, the Property, then a rooming house for 6 families, was expanded to accommodate 7 families in 10 rooms.[4] In March 2018, the Housing

---

[3] The record does not contain a reporter's transcript of Godson's testimony. However, the parties do not dispute the content of her testimony. Our factual summary is drawn from the trial court's written statement of decision.

[4] Gosden reviewed and testified regarding the following documents: a printout from the County Assessor's Office reflecting that the Property was originally built in 1908 as a single–family residence (Exh. A); a building permit from the City showing that a garage was built on the Property in 1926, at which time the Property was being used for residential purposes (Exh. B); a 1946 building permit to modify the existing house stating that Property, then being used as a rooming house for six families, was expanded to accommodate seven families in 10 rooms (Exh. C); and Gosden's March 2, 2018 letter opining that the Property was a rooming house and subject to the Ordinance.

Department issued a "determination letter," authored by Gosden, in which she opined that the Property is subject to the Ordinance, and that the 60–day Notice was an insufficient basis for Tenants' eviction under several provisions of the Ordinance.

Trial proceeded on the premise, undisputed by the parties, that the Property was a "'housing accommodation'" subject to the Ordinance. The issue to be determined by the trial court was whether the Property fell within the exemption for a single–family dwelling. The Landlord argued that the Property fell within the exemption because the structure was originally "designed" in 1908 as a single–family dwelling.

In its detailed written ruling, the trial court disagreed. It observed that no later than 1946, the Property, then being used as a rooming house, was structurally altered and expanded to serve as a home for seven families in 10 bedrooms and, at least since that time, continued to be used as such. Tenants at the Property had locks for and exclusive access to their rented rooms. Under such circumstances, the Property did not qualify as a dwelling unit in which each occupant had access to, and common use of, every "living" area, including all bedrooms. The court found that the Property was "not a single–family residence" because the evidence established it had "been a multi–family residence since before 1946." As a result, the Landlord could "not evict [Tenants] without a notice recognized by the [Ordinance], and not without registering the property with the Housing Department, . . . as required by law."

*Appellate Division Decision*

Landlord appealed to the appellate division. Relying on *Gabor v. Cox* (1994) 26 Cal.App.4th Supp. 16 (*Gabor*), Landlord maintained that under the relevant definitions, the original design of a structure, regardless of current use and physical modifications, controls whether the single–family dwelling exemption applies.

The appellate division largely agreed. Its reasoning had three main prongs. First, the appellant division concluded (citing *Gabor, supra,* 26 Cal.App.4th at p. Supp. 19) that a structure does not cease to be a single–family dwelling, exempt from the ordinance, "simply because a room in the dwelling has been rented out." The reason, according to the appellate division, is that such a "dwelling unit still consists of a group of rooms (one of which is a kitchen) which was *designed* to be occupied by one family for living and sleeping purposes. Nor does a property also cease to be a single–family dwelling simply because it has been expanded to include one or more additional bedrooms and thus has become a larger dwelling unit, or a larger 'group of . . . rooms, one of which is a kitchen, . . . (§ 12.03)."

Second, on a related point, the appellate division concluded "the fact that a building permit includes a notation that a single–family dwelling was used as a rooming house for six families and, later, for seven families, or that an employee of the Housing Department testified, in her opinion, that the structure was a rooming house, [does not] alter in any way whether the structure was '*designed* for occupancy by one family for living and sleeping purposes' [quoting section 1203, with italics] and thus meets the definition of a dwelling unit."

7

Third, the appellate division rejected the trial court's finding that the Property's design was changed no later than 1946 to a "multi–family residence." The appellate division concluded that the trial court relied on a definition of "family" inconsistent with the definition in section 12.03: under section 12.03, a "family" is "[o]ne or more persons living together in a dwelling unit," and "there is no requirement that the persons be related." (*Gabor, supra*, 26 Cal.App.4th at p. Supp. 19 ["'the use of the premises by two unrelated occupants does not render the single–family dwelling a multiple dwelling to bring it within the purview of the [Ordinance]'".) Thus, under section 12.03, "family" includes "*all* of the persons living in the dwelling unit and sharing access to the living, kitchen, and eating areas within the dwelling unit."

In sum, the appellate division held: "on the stipulated facts before the trial court, [the Property] was originally designed and constructed as a single–family dwelling. The facts defendants and other persons living and renting rooms at the house shared access to the kitchen and to the bathrooms meant the rooms were all within the same dwelling unit. Defendants' rooms were thus rooms in a single–family dwelling and, as such, exempt from [the Ordinance]. (*Gabor, supra,* 26 Cal.App.4th at p. Supp. 19 ['The council's intent in providing an exception for single–family dwellings was to exclude from [the Ordinance], all rentals of units in single–family residences.'] As a result, plaintiff was not required to comply with [the Ordinance] in evicting defendants."

8

*Transfer*

We granted Tenants' petitions seeking transfer of the appellate division case to this Court (Cal. Rules of Court, rule 8.1006), and invited the City Attorney to file an amicus brief to address the meaning the relevant terms defined in sections 12.03 and 151.02 as reflected by the language of the LAMC, relevant "legislative history," and interpretation by relevant city entities.

## DISCUSSION

As we explain, we conclude that the Property does not meet the requirements for the exemption from the Ordinance for single–family dwellings. Of course, the interpretation and legal effect of the relevant LAMC ordinances, in particular sections 12.03 and 151.02, is a question of law, which we review de novo. (*Carter v. Cohen* (2010) 188 Cal.App.4th 1038, 1046, fn. 4 (*Carter*).) Established rules of statutory construction are equally applicable to municipal ordinances. (C*arter, supra,* 188 Cal.App.4th at p. 1046, fn. 4; *TG Oceanside, L.P. v. City of Oceanside* (2007) 156 Cal.App.4th 1355, 1374.) As in the case of statutes, we must determine the Council's intent in enacting sections 12.03 and 151.02 so as to effectuate the purpose of the Ordinance. (*Torres v. City of San Diego* (2007) 154 Cal.App.4th 214, 226; *County of Madera v. Superior Court* (1974) 39 Cal.App.3d 665, 668–669.) "'In determining such intent, [we] turn[] first to the words themselves for the answer. We are required to give effect to statutes according to the usual, ordinary import of the language employed in framing them.

9

Moreover, the various parts of a statutory enactment must be harmonized by considering the particular clause or section in the context of the statutory framework as a whole. [Citation.]' [Citation.]" (*Carter, supra,* 188 Cal.App.4th at p. 1046.)

If the language of the ordinance is clear, we need not resort to extrinsic aids. (*Chaffee v. San Francisco Public Library Com.* (2005) 134 Cal.App.4th 109, 114; *Ocean Park Associates v. Santa Monica Rent Control Bd.* (2004) 114 Cal.App.4th 1050, 1064.) A housing board's interpretation of a rent control ordinance is worthy of deference if it comports with the ordinance's principal goal of easing the housing shortage by encouraging the creation of new residential rentals where none existed before. (*Da Vinci Group v. San Francisco Residential Rent etc. Bd.* (1992) 5 Cal.App.4th 24, 30 (*Da Vinci*).) Exemptions from rent control ordinances are construed narrowly. (*Ibid.*)

I. *The Ordinance and Definitions*

The Ordinance was enacted to protect individuals in landlord–tenant relationships: it protects tenants from excessive rent increases and provides a defense to eviction, while at the same time providing landlords with a fair and reasonable return on their investments. (§§ 151.01, 151.02.) The Ordinance applies to any rental unit in a building for which a certificate of occupancy was issued before October 1978, unless it falls within an enumerated exemption. (§§ 151.02,

10

151.04(A), 151.09(A) & (E).)[5] Landlords are prohibited from evicting tenants except for specific reasons stated in the Ordinance. (§ 151.09(A); see *Gross v. Superior Court* (1985) 171 Cal.App.3d 265, 276.) To assure compliance, violations of the Ordinance may be raised as an affirmative defense in an unlawful detainer action. (See § 151.09(E), (F), & (H).)

Several definitions inform our discussion. "Rental unit" is broadly defined to include "[a]ll dwelling units, . . . guest rooms, and suites, as defined in Section 12.03 of [the LAMC] (section 12.03)], and all housing accommodations as defined in Government Code Section 12927 [section 12927] . . . rented or offered for rent for living or dwelling purposes, the land and buildings appurtenant thereto, and all . . . privileges, . . . and facilities supplied in connection with the use or occupancy thereof." (§ 151.02.)[6] A "housing accommodation" is "any building, structure, or

---

[5] The Ordinance provides that, since July 1979, no landlord may demand or accept rent for a rental unit without first procuring and serving on the tenant or displaying in a conspicuous place a valid written registration statement from the Housing Department or its designee. Since April 30, 1983, the Ordinance has also provided that landlords may not demand or accept rent for a rental unit without first serving a copy of a valid registration or annual renewal statement on the tenant of that rental unit. (§ 151.05(A).)

[6] The definition of "rental unit" in the Ordinance was expanded after 10 people died in a disastrous fire in 1993 in an apartment that had been cited for violation of, but never complied with, numerous fire safety codes. The Council's stated purpose for expanding the definition was "to protect every individual in a landlord–tenant relationship."

11

portion thereof that is occupied as, or intended for occupancy as, a residence by one or more families." (Gov. Code, § 12927, subd. (d).)

The Ordinance creates the so–called single–family dwelling exemption by excepting from the definition of rental unit: "Dwellings, one family, except where two or more dwelling units are located on the same lot." (§ 151.02.) The definitions of relevant terms for application of the exemption are found in section 12.03: (1) a "Dwelling" is "[a]ny residential building, other than an Apartment House, Hotel or Apartment Hotel[;]" (2) a "Dwelling Unit" is a "group of two or more rooms, one of which is a kitchen, designed for occupancy by one family for living and sleeping purposes[;]" (3) a "Dwelling, one–family" (or single–family dwelling) is a "detached dwelling containing only one dwelling unit[;]" and (4) a "Family" is defined as "[o]ne or more persons living together in a dwelling unit, with common access to, and common use of all living, kitchen, and eating areas within the dwelling unit."

Combining these interlocking definitions, the scope of the exemption for single–family dwellings applies only if the structure: (1) is a "Dwelling[], one family, except where two or more dwelling units are located on the same lot," and (2) is "detached" and contains "only one dwelling unit." For purposes of the exemption, a "dwelling unit" means "[a] group of two or more rooms, one of which is a kitchen, designed for occupancy by one family for living and sleeping purposes," and "family" means "[o]ne or more persons living together in a dwelling unit, with common access to, and common use of all living, kitchen, and eating areas within the dwelling unit."

12

Here, the Property was originally constructed in 1908 as a "Dwelling, one–family." According to Gosden, in 1946, the Property, then being used as a rooming house for 6 families (apparently using the term "families" generally, not with the specific definition of 12.03), was expanded to accommodate 7 families in 10 rooms. The Property currently has 9 bedrooms, at least two bathrooms, and one kitchen. Four of the bedrooms are being separately rented to four separate households. The tenants share access to the bathrooms and kitchen, but they do not have access to each other's rooms. Rather, each tenant has exclusive use of his or her own bedroom, which is equipped with a lock to exclude others.

Given this undisputed evidence, we conclude that the Property as currently configured and occupied does not qualify for the exemption for a "Dwelling, one–family": within the plain meaning of relevant definitions of section 12.03, it is not a "detached dwelling containing only one dwelling unit." That is, it is not a single "group of two or more rooms, one of which is a kitchen, *designed for occupancy by one family for living and sleeping purposes.*" (Italics added.) The term "family" is defined as "[o]ne or more persons living together in a dwelling unit," meaning that they must live together in the group of two or more rooms, one of which is a kitchen, that forms the dwelling unit. Moreover, besides living in that group of rooms, those persons also must have "common access to, and common use of *all living*, kitchen, and eating *areas* within" that group of rooms. (Italics added.) Thus, to be designed for occupancy by one family, the group of nine bedrooms, at least two bathrooms, and the kitchen contained in the Property must be

13

designed to give the tenants common access to and use of not simply the kitchen, but also all living areas. Here, the tenants do not have common access to and use of all living areas that form the purported dwelling unit, because (as the trial court found) the tenant of each of the four bedrooms being rented has exclusive use of and access to that room. Thus, the tenants do not comprise one family within the meaning of section 12.03, and the Property (whatever its original design) no longer has a design for occupancy by one family, and is not occupied by one family.

The appellate division rejected the conclusion that "the fact the families renting the individual bedrooms had exclusive use of the bedrooms 'clearly [took] the case out of the exception for a house in which everyone has access to every "living area": i.e., bedrooms.'" The appellate division noted that a "family" was defined by section 12.03 as "[o]ne or more persons living together in a dwelling unit, with common access to, and common use of all living, kitchen, and eating areas within the dwelling unit." The appellate division rejected the conclusion that "'all living'" necessarily included bedrooms. The appellate division noted that "dwelling unit" was defined by section 12.03 as a group of at least two rooms, designed for occupancy by a single family "'for living and sleeping purposes. Similarly, 'efficiency dwelling unit' is defined as '[a] room . . . which has a kitchen and living and sleeping quarters combined therein.' Thus, a distinction is made between living and sleeping purposes, and between living and sleeping quarters, so that, at least for purposes of definitions in this section, 'living' does not include 'sleeping.'"

We disagree. The exemption for single–family dwellings incorporates the definitions of "dwelling unit" and "family": the group of rooms (one of which must be a kitchen) that forms the dwelling unit must be "designed for *occupancy* by one family for living and sleeping purposes." (§ 12.03.) The term "occupancy" necessarily implies that within the group of rooms that form the dwelling unit, the person or persons who comprise the family, consistent with the definition of family, have "common access to, and common use of *all living,* kitchen, and eating *areas*" (§ 12.03, italics added), including all bedrooms. Otherwise, the family could not "occupy" the group of rooms forming the dwelling unit. The definition of an "efficiency dwelling unit" is: "[a] room located within an apartment house or apartment hotel used or intended to be used for residential purposes which has a *kitchen and living and sleeping quarters combined therein*." (Italics added.) That an efficiency dwelling unit is defined as a single combined "quarters" for kitchen, living, and sleeping does not suggest that in defining family as applicable to the single–family dwelling exemption, the Council meant to draw a distinction between living and sleeping for all purposes. It also does not mean, given that dwelling unit must be "designed for occupancy by one family," that the Council meant anything less than implementing that occupancy through "common access to, and common use of *all living* . . . areas," including all bedrooms, comprising the single–dwelling unit.

Landlord argues, and the appellate division appeared to agree, that in determining whether a structure qualifies for the single–family dwelling exemption, the original design of the structure controls–once a

15

single–family dwelling, always a single–family dwelling–regardless of changes to configuration and use. We disagree.

Nothing within the plain meaning of the relevant language of section 12.03 suggests that the concept of "design" is immutable, and that changes to the configuration and use of a structure are immaterial in determining the nature of the current design. To the contrary, the relevant language of section 12.03 simply requires that the group of rooms (including a kitchen) comprising the dwelling unit be "designed for occupancy by one family for living and sleeping purposes." It does not say "originally designed," or "originally designed and constructed," and does not say that the design of a structure is determined without reference to its changed configuration and actual use.

Moreover, such a limitation would make little sense. Obviously, renovations expanding a structure and permitting new uses can change its design in form and function. To create and maintain affordable housing, the Council designed the ordinance to cover a broad swath of rental units in buildings for which a certificate of occupancy was issued before October 1978. Only limited exemptions to the Ordinance exist, and those exemptions should be construed narrowly. (*Da Vinci, supra,* 5 Cal.App.4th at p. 30.) We decline to conclude that by using the phrase "designed for occupancy by one family for living and sleeping purposes," the Council intended to overlook the obvious, and to wed the definition of "dwelling unit" for a structure such as the Property here to its original design, and not to current conditions of design and use.

The appellate division rejected the trial court's finding that the Property's design was changed no later than 1946 to a "multi–family

16

residence." The appellate division concluded that the trial court relied on a definition of "family" which required persons be related. According to the appellate division, the relevant definition of family in section 12.03 is family is "'[o]ne or more persons living together in a dwelling unit," and "there is no requirement that the persons be related. [Citation.] Thus, while it may be useful or convenient for other purposes to describe the person or persons renting and sleeping in any one of the bedrooms as 'a family,' the section 12.03 definition of the term would include *all* of the persons living in the dwelling unit sharing access to the living, kitchen, and eating areas within the dwelling unit." (Italics in orig.)

It is true that the definition of family does not require familial relation, but that fact does not affect the result here. As we have explained, based on the interlocking definitions of "dwelling unit" and "family," because Tenants (regardless of familial relationship) do not have common access to and use of all living areas that form the purported dwelling unit, they do not comprise one family within the meaning of section 12.03.

The lead opinion in *Gabor, supra*, on which Landlord and the appellate division rely, does not change our analysis. In *Gabor*, a homeowner rented the downstairs portion of a three–floor structure described as a "single–family residence." It had a single street address and was located in "an exclusively single–family residential community." (*Id*. at p. Supp. 19.) The tenant's portion contained a kitchen, bathroom, and family and storage rooms. (*Id*. at p. Supp. 18.) Another floor also contained a kitchen, as well as two bedrooms, a

17

bathroom, and living and dining rooms.  (*Ibid.*)  A washer and dryer, and the water heater and furnace for the house were located in the downstairs portion, and accessible only by going through the main area of the tenant's rented space.  (*Ibid.*)  The tenant did not have exclusive right of possession to the downstairs space, and agreed to allow the landlord access to the washer, dryer, water heater and furnace.  (*Ibid.*)

The lead opinion for two judges in *Gabor* conceded that because there were two kitchens, there were two dwelling units within the meaning of section 12.03.  But the majority reasoned that the Council's "intent in providing an exception for single–family dwellings was to exclude from [the Ordinance] all rentals of units in single–family residences." (*Gabor, supra*, 24 Cal.App.4th at p. Supp. 19.)  Thus, although the tenant's living area constituted a separate dwelling unit, the building did "not constitute a two–family dwelling.  [The] building 'has one address applicable to it.'  This is a single–family residence, in an exclusively single–family residential community.  Besides outside access to the unit in question, there is also internal access by an interior stairway.  Thus, the trial court correctly found that the exception set forth in section 151.02 applies in this case."  (*Ibid.*)

The third judge on the panel concurred in the judgment on other grounds not here relevant, but disagreed with the reasoning of the lead opinion.  As the concurrence noted:  "[t]he majority opinion concedes that appellant's living area was a 'dwelling unit' under the Los Angeles Rent Stabilization Ordinance.  Since two families occupied the house, the unit was necessarily a 'dwelling containing two dwelling units' and subject to rent control.  The fact that the community consisted

18

exclusively of single–family dwellings means only that plaintiff was renting an illegal unit. Surely the fact that an owner creates and rents an illegal unit should not provide an exemption from rent control." (*Gabor, supra*, 26 Cal.App.4th at p. Supp. 20, concurring opn.)

The analysis of the lead opinion in *Gabor* is unsupportable. The lead opinion declared an overarching intent to "exclude [from the Ordinance all] rentals of units in single–family residence" (*id.* at p. Supp. 18), and from that premise concluded the structure at issue was a "single–family residence" based on criteria not listed in the relevant ordinance provisions. The majority ignored the relevant definitions that give meaning to the exemption for single–family dwellings. There is no exemption for a "single–family residence" per se as that term is meant in common parlance but rather only for any "Dwelling, one–family," defined as a "detached dwelling containing only one dwelling unit." (§ 12.03.) Thus, because it had two dwelling units, the building in *Gabor* did not qualify for the exemption for single–family dwellings. For this reason, we disapprove the analysis and holding of *Gabor*. (See § 12.03.)[7]

---

[7] Even if the lead opinion in *Gabor* could withstand scrutiny (it cannot), it would not support Landlord's sweeping interpretation of its holding. Contrary to Landlord's contention, *Gabor* did not hold that only a building's original design, not the use to which it is put, dictates whether it is covered by the single–family dwelling exemption. To the contrary, at best it would stand for the proposition that a building containing multiple dwelling units can still be considered a single–family dwelling so long as it has one address, is in an exclusively single–family residential community, and has "outside access to the unit in question" as well as "internal access by an interior stairway." (*Gabor, supra*, 26 Cal.App.4th at p. Supp. 19.) That holding

In short, in the Property at issue here, Tenants' individual rooms are covered by the Ordinance as non–exempt rental units. A "rental unit" is a "dwelling unit[ ]" rented for "living or dwelling" purposes. (§ 151.02.) A "dwelling, one–family" is a "detached dwelling containing only one dwelling unit." (§ 12.03.) To be exempt from the Ordinance, a single–family dwelling must be "detached." (§ 12.03.) Tenants' rental units are not detached. Each is part of a single larger structure containing other rental units. Thus, Tenants' rooms are rental units within the meaning of section 151.05(A), and the Property is subject to the requirements and restrictions of the Ordinance, including notice and annual registration. Unless and until Landlord satisfied the requirements of the Ordinance, Tenants could not be evicted.[8]

would not apply to the Property at issue here. It is not located in a single–family residential community, but in an area zoned for multiple dwellings. (See Zoning Information & Map Access System <http://zimas.lacity.org> [as of April 23, 2019] [reflecting that 1163 South Hoover Street is in an "R4" zone for multiple dwellings]; § 12.11(A) ["R4" zoning is for multiple dwellings].) Further, nothing in the evidence suggests the existence of other conditions comparable to those found (incorrectly) to be controlling in *Gabor*.

[8] During oral argument Landlord's counsel raised the specter that a holding excluding the Property from the single–family dwelling exemption, taken to its extreme, could be construed to apply in a situation where a homeowner in the City rents one of several bedrooms in her family's home to an individual (say, a student at a nearby college), who shares access to the living and eating areas, and kitchen. Landlord claims the home would no longer be a single–family dwelling exempt from the Ordinance, and the homeowner could be forced to rent indefinitely to that person. No such tenancy is presented by the facts of this record, and the determination whether a particular structure satisfies the criteria for the single–family dwelling exemption is necessarily a fact–dependent inquiry. Here, whatever its original design and use, the structure at issue has been altered to add

20

**DISPOSITION**

The judgment of the appellate division is reversed. Appellants are entitled to their costs on appeal.

**CERTIFIED FOR PUBLICATION**

WILLHITE, Acting P. J.

We concur:

COLLINS, J.

CURREY, J.

---

multiple rooms which are now (and have been in the lengthy past) rented by multiple tenants with exclusive access to their units. Such a structure is not a "Dwelling, one–family" as defined in the relevant provisions. (§ 12.03.)

We express no opinion as to whether, in a hypothetical case, the owner of a home who simply rents to a boarder is subject to the Ordinance. That is not the case before us. Nonetheless, we suggest it would be beneficial for the City Council to consider amending the Ordinance to specifically address such a circumstance, as other cities have done. (See e.g., West Hollywood Muni. Code., art. 3, § 17.24.010(a)(3) [exempting rooms rented to boarders "where the landlord owns the residence and shares kitchen or bath facilities with the tenants" and lives in the residence]; ch. 37, San Francisco Admin. Code, § 37.9(i)(2) [stating that designated provisions of the rent control ordinance "shall not apply where there is only one rental unit owned by the landlord in the building."].)

21